UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:19-mc-3710 |
| | § | |
| LAURIE L. CHRISTENSEN, | § | |
| HARRIS COUNTY FIRE MARSHAL, | § | |
| | § | |
| Respondent. | § | |

**PETITION TO ENFORCE ADMINISTRATIVE SUBPOENAS ISSUED BY
UNITED STATES CHEMICAL SAFETY AND HAZARD INVESTIGATION BOARD**

Respectfully submitted,

RYAN K. PATRICK
UNITED STATES ATTORNEY

BY:      _/s/ Jose Vela Jr._
Jose Vela Jr.
Assistant United States Attorney
Attorney in Charge
Fed ID# 25492
Texas State Bar No. 24040072
1000 Louisiana Street, Suite 2300
Houston, Texas 77002
(713) 567-9000
Fax: (713) 718-3300
Email: Jose.Vela@usdoj.gov

Attorney for Petitioner

## **TABLE OF CONTENTS**

I.    INTRODUCTION..................................................................................................... 1

II.   JURISDICTION AND VENUE. ............................................................................. 1

III.  THE PARTIES. ....................................................................................................... 2

IV.   BACKGROUND...................................................................................................... 5

V.    RESPONDENT'S FAILURE TO COMPLY WITH SUBPOENAS.............................13

VI.   CAUSE OF ACTION............................................................................................. 18

VII.  PRAYER FOR RELIEF...........................................................................................24

# TABLE OF AUTHORITIES

**UNITED STATES CONSTITUTION**                                               **PAGE(S)**

U.S. Constitution., Article VI, Clause 2..……………………………………………………20

## CASES

*Burlington Northern Railroad v. Office of Inspector General of the Railroad Retirement Board,*
    983 F.2d 631 (5th Cir. 1993)............................................................13, 14, 18, 19

*Cooper v. Aaron,*
    358 U.S. 1 (1958)…………………………………………………………………...20

*Edgar v. Mite Corp.,*
    457 U.S. 624 (1982)...........................................................................................20

*Endicott Johnson Corp. v. Perkins,*
    317 U.S. 501 (1943)...................................................................................14, 19

*FTC v. Jim Walter Corp.,*
    651 F.2d 251 (5th Cir. 1981)…………………………….......................... 19

*Gade v. National Solid Wastes Management Ass'n,*
    505 U.S. 88 (1992)…………………………….. ...…………………………….......20-21

*In re Ramirez,*
    905 F.2d 97 (5th Cir. 1990)..........................................................................19

*McCulloch v. Maryland,*
    17 U.S. 316 (1819)…………………………………………………………….20

*Oklahoma Press Publishing Co. v. Walling,*
    327 U.S. 186 (1946)…………………………………………………………….19

*PLIVA, Inc. v. Mensing,*
    *564 U.S. 604 (2011)*……………………………………………………….…… 22

*United States v. Chevron U.S.A., Inc.,*
    186 F.3d 644 (5th Cir. 1999)........................................................................19

*United States v. Davis,*
    636 F.2d 1028 (5th Cir. 1981)…………………………………………...14

*United States v. Powell,*
    379 U.S. 48 (1964)....................................................................13, 14, 18

*United States v. Texas Heart Institute*,
    755 F.2d 469 (5th Cir. 1985)…………………………………………………14

*United States v. Wilson*,
    864 F.2d 1219 (5th Cir. 1989)………………………………………………...14

*United States v. Transocean Deepwater Drilling, Inc.*,
    767 F.3d 485 (5th Cir. 2013)……...........................................................13-14, 18

*United States Department of Justice v. Utah Department of Corrections*,
    *2017 U.S. Dist. LEXIS 118470, *16-17 (D. Utah July 27, 2017)* …………………………..22

*Winters Ranch Partnership v. Viadero*,
    123 F.3d 327 (5th Cir. 1997)…………………………………………………... 19

## STATUTES

5 U.S.C. § 552(b)(5)……………………………………………………………23

5 U.S.C. § 7(a)……………………………………………………………...23

28 U.S.C. § 1345………………………………………………………………...1

28 U.S.C. § 1391(b)…………………………………………………………….1

42 U.S.C. § 1600.3(b)…………………………………………………………3

42 U.S.C. § 7412(r)(6)…………………………………………………………2

42 U.S.C. §§ 7412(r)(6)(A)-(S)……………………………………………………1

42 U.S.C. § 7412(r)(6)(C)…………………………………………………………6

42 U.S.C. § 7412(r)(6)(C)(i)…………………………………1, 2, 6, 13, 15, 18

42 U.S.C. § 7412(r)(6)(C)(ii)……………………………………………………3

42 U.S.C. § 7412(r)(6)(E)……………………………………………2, 6, 15, 18

42 U.S.C. § 7412(r)(6)(G)……………………………………………………..3

42 U.S.C. § 7412(r)(6)(L)………………………………………………………18

42 U.S.C. § 7412(r)(6)(L)(i)……………………………………………… 1, 2, 18

42 U.S.C. § 7412(r)(6)(M).................................................................................1-3, 13, 18

42 U.S.C. § 7412(r)(6)(Q).................................................................................23

42 U.S.C. § 7607(a)........................................................................................ 1-3, 13, 18

Clean Air Act Amendments of 1990, 42 U.S.C. § 7412(r)(6); Pub. L. 101-549,
Title III, § 301, 104 Stat. 2399, 2531 (November 15, 1990)…………………………………2

Senate Report Number 101-228, 101st Congress, 1st Session 211 (1989) ………………………4

## I.    INTRODUCTION

1.    The United States of America, on behalf of its agency, the United States Chemical Safety and Hazard Investigation Board ("CSB" or "Board"), petitions this Court to require Respondent Laurie L. Christensen, the Fire Marshal of Harris County, Texas ( "Respondent"), to comply fully with two CSB administrative subpoenas. These subpoenas, properly served on Respondent Christensen on June 21, 2019, called for production of documents on July 8, 2019.  As of the date of this filing, Respondent has refused to submit a single document, even unobjectionable documents, photos, and other similar information already provided to others. Accordingly, the United States has filed this Petition to Enforce, and avers to this Court as follows:

## II.    JURISDICTION AND VENUE

2.    This is a proceeding brought pursuant to the provisions of 42 U.S.C.§§ 7412(r)(6)(A)-(S), and more specifically §§ 7412(r)(6)(C)(i), L(i), and (M), as well as 42 U.S.C. § 7607(a) to enforce two CSB subpoenas duces tecum for information critical to ongoing CSB investigations.  This Court has jurisdiction under 28 U.S.C. § 1345, 42 U.S.C.§§ 7412(r)(6)(A)-(S), and 42 U.S.C. § 7607(a).

3.    Pursuant to 28 U.S.C. § 1391(b), venue is proper in that Respondent is the Fire Marshal of Harris County, the county that covers the geographical location of the two different chemical accidents under investigation by the CSB at issue in this Petition. The Respondent maintains both of its offices within Harris County. The Respondent has control of information needed by the CSB to conduct its investigations. The Respondent, and the materials sought within her possession and/or control, and her office's "keeper of records" are properly subject to the CSB's subpoena powers enumerated above.

### III.     THE PARTIES

4.      The CSB is an independent federal investigative safety agency of the United States  Government which was established by the Clean Air Act Amendments of 1990 and became operational in 1998.  *See* 42 U.S.C. § 7412(r)(6); Pub. L. 101-549, Title III, §  301, 104 Stat. 2399, 2531 (November 15, 1990); *see generally* https://www.csb.gov/about-the-csb/. CSB is authorized by law to "investigate (or  cause to be investigated), determine and report to the public in writing the facts, conditions, and  circumstances and the cause or probable cause of any accidental release resulting in a fatality,  serious injury or substantial property damages." 42 U.S.C. § 7412(r)(6)(C)(i). In the CSB's enabling statute, Congress further mandated:  "In no event shall  the Board forego an investigation where an accidental release causes a fatality or serious injury  among the general public, or had the potential to cause substantial property damage or a number  of deaths or injuries among the general public."  42 U.S.C. § 7412(r)(6)(E).  The CSB has jurisdiction to issue the subpoenas pursuant to 42 U.S.C. §§ 7412(r)(6)(C)(i), (L)(i), (M), and 7607(a).  In support of this mission, CSB:

a.      The CSB enabling statute states: "upon authority of the Board, any member thereof, any administrative law judge employed by or assigned to the Board, *or any officer or employee duly designated by the Board*, may for the purpose of  carrying out duties authorized by subparagraph (C)(i) hold such hearings,  sit and act at such times and places, administer such oaths, and *require by  subpoena or otherwise attendance and testimony of such witnesses and the production of evidence and may require by order* that any person engaged  in the production, processing, handling, or storage of extremely hazardous  substances *submit written reports and responses to requests and questions  within such time and in such form as the Board may require.*"  42 U.S.C. §  7412(r)(6)(L)(i) (all emphasis added).

2

b.      "may use any information gathering authority of the Administrator [of the EPA] under this chapter, including the subpoena power provided in [42 U.S.C. §] 7607(a)(1)." 42 U.S.C. § 7412(r)(6)(M).  42 U.S.C. § 7607(a) states, in pertinent part, that the "Administrator may issue subpoenas for the attendance and testimony of witnesses and the production of relevant papers, books and document . . . [and] [i]n case of contumacy or refusal to obey a subpoena served upon any person under this subparagraph, the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such persons, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof."

c.      Like the National Transportation Safety Board, upon which it was modeled, the CSB's investigations are not intended for regulatory compliance, or civil or criminal enforcement, purposes.  Rather, the CSB has a broad public safety mission focused on investigating accidental releases and recommending measures to prevent and minimize the risk of industrial chemical accidents.  *See* 42 U.S.C. § 7412(r)(6)(C)(ii); *see also* 42 U.S.C. §1600.3(b).  Further, "[n]o part of the conclusions, findings or recommendations of the Board relating to any accidental release or the investigation thereof shall be admitted as evidence or used in any action or suit for damages arising out of any matter mentioned in such report."   42 U.S.C. § 7412(r)(6)(G).

d.      The CSB conducts systematic root cause investigations into accidental releases arising under its jurisdiction. The agency's legislative history informs the CSB that is must pursue an "all cause" theory of causation, going far beyond the mere mode of failure, such as a

3

corroded pipe or a malfunctioning valve.

> The purpose of the investigation is to determine the conditions and circumstances which led up to the accident and to identify the cause or probable cause. It is not the role of the Board to apportion blame or to fix liability; that is the responsibility of a court of law. Rather, the Board is to identify those actions, omissions, events, and conditions (or combination thereof) which led to the accident or incident for the purpose of recommending modifications to processes, equipment, and procedures to prevent similar accidents or incidents in the future. The Board should take on "all cause" theory in discharging its investigatory duties. It is not the single, necessary or sufficient cause which is to be the focus of the Board's inquiry, but all circumstances which contributed to the accident (and which may effectively be modified to improve safety) are circumstances of concern. "Multiple causation" is, in fact, the norm and it is expected that the Board will follow many strands of inquiry in response to each accidental release."

Sen. Rep. No. 101-228, 101st Cong., 1st Sess. 211 (1989).

By necessity, therefore, the CSB examines safety systems, management decision-making, staffing, technology, as well as existing local, state and federal regulatory structures and oversight, along with efforts by first responders, in an effort to understand what happened and why, to educate stakeholders on the facts and circumstances of the underlying incident, and to propose and advocate for needed safety recommendations to ensure the entire industry improves and the same or similar accidents do not recur.

5.      Respondent, Laurie L. Christensen, is the Fire Marshal for Harris County, Texas, an appointed county official. Respondent conducts business exclusively in Harris County, Texas, maintains two offices in the county, and maintains her agency's headquarters at 2318 Atascocita Road, Humble Texas, 77369 (https://www.hcfmo.net/officeLocations.aspx). Both offices are located within the Houston Division of the United States District Court for the Southern District of Texas.  Respondent's office's mission statement states: "The mission of the Harris County Fire Marshal's Office is to safeguard the lives and property of the residents in Harris County through effective fire prevention, fire investigation, education, emergency

response, and emergency management." https://www.hcfmo.net/whoWeAre.aspx.

### IV.   BACKGROUND

6.      The CSB is conducting investigations into two separate accidental releases within its established investigative jurisdiction, at two different sites, owned and operated by two different companies, both of which are located in Harris County, Texas. Both investigations are being improperly delayed and impeded by the Respondent due to Respondent's failure to produce information in her possession that the CSB needs to conduct its investigations. The two investigations are:

a.      International Terminal Company, CSB Investigation Number 2019-02-I-TX. The CSB is investigating the massive tank fire which occurred at the Intercontinental Terminal Company (ITC) at 10:00 am on March 17, 2019 at the company's facility in Deer Park, Texas. The fire engulfed 11 above ground storage tanks containing a variety of hydrocarbons. The burning hydrocarbons sent a plume of hazardous materials into the areas surrounding the facility, which resulted in a significant threat to the local populace, and multiple orders for community members to shelter in place. The fire and explosion also caused significant damage to private property and economic loss. *See* Exhibit 1, ¶ 15, Sworn Declaration of Daniel Tillema, CSB Investigator-In-Charge and Investigations Supervisor; *see also* https://www.csb.gov/intercontinental-terminal-company-itc-tank-fire/.

b.      KMCO, LLC, CSB Investigation Number 2019-01-I-TX. The CSB is investigating the fire and explosion which occurred at the KMCO custom chemical process and specialty chemical manufacturing facility in Crosby Texas which occurred at 10:46 am on April 2, 2019. The fire and explosion caused one fatality, injured a total of 30 workers – many of whom suffered serious injuries – as well as significant damage to private property, economic

loss, significant job loss, and the smoke from the burning chemicals posed a threat to the local community and led to a shelter in place for people living within one mile of the facility.   *See* Ex. 1, ¶ 30; *see also* https://www.csb.gov/kmco-llc-fatal-fire-and-explosion-/.

      c.      Both incidents involved the accidental release of hazardous liquid hydrocarbons, flammable gas, chemicals, and regulated substances or extremely hazardous substances, into the ambient air. The ITC incident resulted in substantial property damage and posed a threat to the health of residents in the community surrounding the facilities and the public at large. The KMCO incident resulted in a fatality, serious injuries, and posed a threat to the health of residents in the community surrounding the facilities and the public at large.  Ex. 1, ¶¶ 15-17, 30-32.

      d.      These investigations required deployment of six CSB investigators, along with a significant commitment of time, money and other resources by the entire agency to investigate these serious incidents. Ex. 1, ¶¶ 16, 33. In fact, at the time of the deployments, the CSB only had seven chemical incident investigators. Thus, the CSB committed nearly all of its investigators to investigate these twos serious accidents.  *See* Ex. 1, ¶¶ 16, 33.

      7.      As a matter of law, pursuant to 42 U.S.C. § 7412(r)(6)(C), the CSB is investigating the accidental release of regulated substances or other extremely hazardous substances from both sites into the ambient air.  Indeed, due to the resulting and potential fatalities, serious injuries, threats to the health of residents in the community surrounding the facilities and the public at large, and substantial property damage, the CSB is required by 42 U.S.C. §§ 7412(r)(6)(C)(i), and (E), to investigate these incidents.

      8.      On March 21, 2019, in accordance with the CSB's enabling statute, and in compliance with all internal agency requirements the CSB deployed investigators to ITC. On

April 2, 2019, during the early phase of the ITC deployment, the KMCO incident occurred. On

April 3, 2019, in accordance with the CSB's enabling statute and in compliance with, CSB

investigators were then jointly and simultaneously deployed to that incident as well.  Ex. 1, ¶¶

15-16, 22-23, 31-32.

9.      As it does in the majority of serious, large-scale chemical incidents where the

CSB deploys large investigative teams of investigators, the deployed CSB team members were

prepared to conduct parallel investigations of both incidents, potentially alongside other federal,

state and local investigative agencies, first responders, representatives of insurers, legal counsel

for emerging plaintiffs, and other potentially interested parties. The investigators in charge of

both investigations on behalf of the CSB, and the investigations supervisor involved in both

investigations, have all investigated numerous serious accidental releases under the CSB's

jurisdiction, including at least three recent accidents in Harris County, and multiple parallel

investigations where simultaneous local, state and federal investigations were initiated by a

variety of investigative agencies.  Ex. 1, ¶¶ 1-14.

10.      On March 21, 2019, and April 3, 2019, the CSB informed ITC and KMCO,

respectively, of investigations the CSB was launching into the incidents which occurred at their

facilities and instructed representatives of both companies to ensure that all relevant evidence

be preserved, unaltered, and protected from damage or destruction.   *See* Exhibit 2, April 3,

2019 Evidence Preservation Letter from CSB to ITC, and Exhibit 3, April 3, 2019 Evidence

Preservation Letter from CSB to KMCO; *see also* Ex. 1, ¶¶ 16, 31.

11.      Both companies were fully cooperative with the CSB's efforts, until CSB

investigators were told by representatives of both companies that they were instructed by

members of the HCFMO to stop cooperating with the CSB.  Subsequently, representatives of

the HCFMO also confirmed their direction for companies to cease cooperating with the CSB to

CSB investigators.  Ex. 1, ¶¶ 18-25, 33-35.

      12.    Respondent Fire Marshal, through its representatives and through legal counsel,

informed the CSB that the Fire Marshal's office investigation took precedence over the work of

the CSB due to the lack of an "enforcement" mandate in the CSB's mission, and sought to

block the CSB from accessing information it needed (and still needs) for completion of its

investigations. As law enforcement, the Fire Marshal's office physically controlled the site, and

so the CSB had to defer its investigations using its own authorities at least temporarily,

pursuant to an arrangement that the Fire Marshal would share information with the CSB;

however, the CSB later discovered that the Fire Marshal would not keep her word and would

not voluntarily share the needed information.  Ex. 1, ¶ 51.

      13.    The CSB had promptly and efficiently sought to commence these two

investigations. In unprecedented fashion, the CSB experienced significant delays caused by the

interference and obstruction of a county government official during the early phase of its

federal investigation. Specifically, CSB investigators sought to take their own independent

photos and video footage of the accident sites and equipment, requested and collected

documents through standard document requests and attempted to obtain timely witness

interviews while witnesses remained nearby, with fresh recollections of key facts and events, in

accordance with good investigative practice. The CSB investigators were extremely

uncomfortable with these delays but understood the delays were predicated on assurances of

Harris County officials, including the Fire Marshal and representatives of her office, as well as

legal officials from Harris County.  *See* Ex. 1, ¶¶ 18, 23, 45-46.  The CSB, however, could only

wait so long without compromising the efficiency and effectiveness of its deployed

investigators' efforts in the field, wasting value time, resources and opportunities to accomplish critical tasks, in reliance on county officials' assurances of subsequent cooperation and relatively positive past experiences in the jurisdiction with respect to information sharing.

14.     The CSB made repeated requests for voluntary production of this same information throughout the early phase of the investigation. Those requests were not honored and information was not provided by Respondent.  Ex. 1, ¶¶ 45, 51.

15.     Respondent was and still is in possession and control of documents, information, and other tangible  evidentiary items that are relevant to the above-described investigation. As a result, the CSB needed to move forward with a more formal demand for production of information needed to conduct its investigations.

16.     <u>First Set of Subpoenas</u>. On May 21, 2019, the CSB originally served two subpoenas on the Harris County Attorney's Office to Barbara Armstrong, Managing Attorney, General Counsel Group of Harris County. One was focused on ITC, the other focused on KMCO. The subpoenas were based on the previously requested information relative to the CSB's investigations into the ITC tank farm fire and KMCO chemical explosion and fire, and quite similar in scope and content to previous subpoenas issued to Ms. Armstrong in past investigations where there were no objections made and Harris County complied by mailing the desired information to the CSB's Western Regional Office in Denver, Colorado.[1]  The reasons

---

[1] For example, in the CSB's DuPont investigation in Harris County, Mr. Tillema served a subpoena on Ms. Armstrong for the following:  "Any and all records relating to the November 15, 2014, multi-fatality incident at the DuPont facility in La Porte, Texas, including but not limited to photographs, video recordings, atmospheric gas testing, air monitoring, witness statements, deployment information, notes, and correspondence." The County provided the CSB with the information demanded in this serious accident involving four fatalities and significant potential danger to the public was produced in a timely fashion, in accordance with the standard instructions provided, and with no objections or concerns expressed. Similarly, the CSB served Attorney Sarah Utley for information in its Arkema investigation, and the County provided the CSB with the information demanded, again with no objections or concerns expressed. Ex. 1, ¶ 14.

for serving Ms. Armstrong with these two subpoenas were that the CSB had been instructed to coordinate all information requests with Harris County through her. In addition, this was also the same procedure utilized by the CSB when it issued "friendly" subpoenas to Harris County in the CSB's DuPont La Porte and Arkema investigations, with positive results in both past instances.  Ex. 1, ¶¶ 40-43.

17.     On March 25, 2109, the Harris County Attorney's Office submitted objections to both subpoenas. The objections specified were:  that the subpoenas sought "information protected by the attorney client privilege," that the "information is protected attorney work product," and that "the subpoena is beyond the geographical scope of range."  *See* Exhibit 4, "Response and Objections to Subpoena – ITC Tank Farm Fire," dated March 25, 2019, signed Graylon D. Wells, and Exhibit 5, "Response and Objections to Subpoena – KMCO Explosion and Fire," dated March 25, 2019, signed Graylon D. Wells.

18.     Harris County then concluded its response, noting "Notwithstanding the above listed objections, Respondent is not in possession of any documents responsive to this request." *Id*.; *see also* Ex. 1, ¶¶ 27, 43.

19.     Second Set of Subpoenas. While the CSB asserts that the service on Ms. Armstrong was proper, comported with Harris County Attorney's Office direction on who the appropriate contact was supposed to be (and had been in past investigations), and that all indications are that the information sought was either in Ms. Armstrong's control or possession, the CSB nonetheless prepared a second set of subpoenas on Respondent directly as the head of the Harris County Fire Marshal's Office and the "keeper of records" within her own office.  Ex. 1, ¶¶ 28, 44.

20.     On June 14, 2019, the undersigned attorney sent an email requesting voluntary and negotiated resolution of the CSB's subpoenas issued to the Respondent.  *See* Exhibit 10, email from U.S. Attorney to legal counsel for Respondent.

21.     On June 21, 2019, the CSB served Respondent with a subpoena for records relevant to the agency's ITC investigation.  *See* Exhibit 6. That subpoena demanded production of:  (1) Video recordings, including but not limited to, drone footage, GoPro footage, hand-held camera footage, or similar video related to the ITC incident; (2) Photos in their native digital format related to the ITC incident; (3) Incident or incident response report(s) related to the ITC incident; and  (4) Scribe notes related to the  ITC incident. The subpoena also contained detailed instructions related to compliance. Instructions included production of demanded information by July 8, 2019, at the local United States Attorney's Office, in care of the undersigned attorney, located at 1000 Louisiana Street, Suite 2300, Houston, Texas, 77002. Ex. 6.

22.     On June 21, 2019, the CSB also served Respondent with a subpoena for records relevant to the agency's KMCO investigation.  *See* Exhibit 7. That subpoena demanded production of:  (1) Employee, contractor, or witness interview records including, but not limited to, notes, summary documents, or recordings; (2) Video recordings including, but not limited to drone video, and GoPro or similar devices; (3) Photographs in their native digital format; and  (4) Incident response report(s); (5) Injury reports (if any) for personnel injured as part of the KMCO incident response efforts; (6) Any subpoena issued to KMCO; (7) Records which indicate the names of any Harris County Fire Marshal or KMCO personnel who participated in removal of the y-strainer; and (8) Records of the y-strainer removal not included in the above requests, such as notes or written plans. The subpoena also contained the same

detailed instructions related to compliance as had accompanied service of the ITC subpoena,

including the same July 8, 2019 deadline for compliance, and the same location local address

for production of the demanded documents.  Ex. 7.

23.     Respondent failed to comply with the subpoenas and did not produce any

records as required by the subpoenas.  Ex. 1, ¶¶ 29, 43, 45-47, 49, 51.

24.     Instead, on July, 8, 2019, Respondent filed objections to the subpoenas with Mr.

Vela, none of which have any merit. *See* Exhibit 8, "Respondent's Objections to Chemical

Safety and Hazard Investigation Board's June 24, 2019 Subpoena Relating to the ITC Tank

Farm Fire," dated July 8, 2019, signed by Lisa R. Hulsey; and Exhibit 9, "Respondent's

Amended Objections to Chemical Safety and Hazard Investigation Board's June 24, 2019

Subpoena Relating to the KMCO Explosion and Fire," dated July 8, 2019, signed by Lisa R.

Hulsey. Respondent objected to the subpoenas on several grounds, as summarized in

paragraphs 25-26, *infra*.

25.     First, Respondent alleges that somehow providing the CSB this basic

information will somehow "interfere with Respondent's "detection, investigation and

prosecution of crime." Second, Respondent asserts that the CSB subpoena commanded

production of "preliminary advice, opinions and recommendations and other information" with

respect to Respondent's work onsite. Third, Respondent wrongly applies 42 U.S.C. §

7412(r)(6)(Q) that somehow the CSB would receive material pursuant to the subpoena and

simply make it available to the public, which is false (see discussion, *infra*, in ¶ 44), ignores the

section of the directions that invites those parties who are subject to a CSB subpoena to

annotate what materials (if any) may be confidential or otherwise privileged from disclosure,

and ignores past experience with the CSB where no issue involving the release of sensitive

information ever occurred.

26.     Second, Respondent also raises some the following technical objections, citing ambiguity, questions over the formats of electronically stored information, production of information in draft form, information that is cumulative or duplicative, and/or information that is available from some other source. These objections lacked appropriate support in law and fact and ignored the legal effect of the Supremacy Clause of the U.S. Constitution as well as well-established federal law and interpretive case law regarding the enforcement of administrative subpoenas by a federal agency.

27.     Each objection raised by Respondent lacks merit and none relieve respondent of its obligation to produce the information sought in the subpoenas. Respondent ignored the legal effect of the Supremacy Clause of the U.S. Constitution as well as well-established federal law and interpretive case law regarding the enforcement of administrative subpoenas by a federal agency.

## V.     RESPONDENT'S FAILURE TO COMPLY WITH SUBPOENAS

28.     This Court is authorized to enforce the subpoenas under 42 U.S.C.§§ 7412(r)(6)(C)(i), L(i), M, and 42 U.S.C. § 7607(a), and in accordance with the standard set forth in *United States v. Powell*, 379 U.S. 48, 57-58 (1964).  Under *Powell*, the United States must establish four elements: (1) there must be a legitimate purpose of the investigation; (2) the specific inquiry must be relevant to that purpose; (3) the information sought must not already be in the CSB's possession; and (4) all internal administrative procedures must have been followed.  *See Powell*, 379 U.S. at 57-58. *See also United States v. Transocean Deepwater Drilling, Inc.,* 767 F.3d 485, 489 (2014), *citing Burlington Northern Railroad v. Office of Inspector General of the Railroad Retirement Board*, 983 F.2d 631, 638 (5th Cir. 1993)

(condensing requirements for judicial enforcement of administrative subpoenas three factors: "(1) the subpoena is within the statutory authority of the agency; (2) the information sought is reasonably relevant to the inquiry; and (3) the demand is not unreasonably broad or burdensome.").

29.     The *Powell* standard is intended to be "a minimal burden" and one "which may be met by a simple affidavit filed with the petition to enforce."     *United States v. Texas Heart Institute*, 755 F.2d 469, 474 (5th Cir. 1985); *see also Burlington Northern Railroad v. Office of Inspector General of the Railroad Retirement Board*, 983 F.2d 631, 637 (5th Cir. 1993) ("It is settled that the requirements for judicial enforcement of an administrative subpoena are minimal.").     *See also Endicott Johnson Corp.*, 317 U.S. at 509; *United States v. Transocean Deepwater Drilling, Inc.*, 767 F.3d at 489; *Ramirez*, 905 F.2d at 98-99.

30.     If this Court determines that the United States has established its prima facie case under *Powell*, the burden of going forward shifts to Respondent. *See United States v. Wilson*, 864 F.2d 1219, 1222 (5th Cir. 1989); *United States v. Transocean Deepwater Drilling, Inc.*, 767 F.3d at 489.  The Court may order Respondent to "show cause" why it is not required to comply with the subpoenas.  *Wilson*, 864 F.2d at 1222; *United States v. Davis*, 636 F.2d 1028, 1034 (5th Cir. 1981).  Respondent may meet its "show cause" burden by: (1) "disprov[ing] one of the four elements of the United States prima facie showing" under *Powell*; or (2) "demonstrat[ing] that judicial enforcement of the summons would otherwise constitute an abuse of the court's process.  *Davis*, 636 F.2d at 1034 (burden of proof on the taxpayer to show abuse of court's process, such as to harass a party or to force a party to settle a collateral matter, or for any purpose not done in good faith). The United States meets the *Powell* standard as follows:

14

31.   <u>Legitimate purpose</u>. There is a legitimate purpose to the two current investigations in which the CSB issued administrative subpoenas. The CSB is statutorily authorized and mandated to investigate and report to the public in writing the facts, conditions, and circumstances and the cause or probable cause of the release of hazardous liquid hydrocarbons, flammable gas and other regulated substances or extremely hazardous substances into the ambient air  a n d  both incidents resulted in either fatalities, serious injuries, threats to the health of residents in the community surrounding the facilities and the public at large, and substantial property damage.  Ex. 1; 42 U.S.C. §§ 7412(r)(6)(C)(i), (E).

32.   <u>Relevance</u>. The information requested in the aforementioned subpoenas, and explained in detail above, is relevant and necessary for CSB to properly investigate both of these incidents. Ex. 1, ¶¶ 1-3, 26, 37.  Each and every demand for information is relevant.  Ex. 1, ¶¶ 1-3, 26, 37, 43, 45, 48, 52.

a.    In its subpoena for information relating to the ITC investigation, the CSB demanded production of critical information it would normally obtain early in an investigation. As explained in Paragraph 4, *supra*, CSB chemical incident investigators – more than any other investigators from state or federal government agencies at work within the chemical industry – are conducting a technically oriented, "all cause" investigation, and it is essential that even the most minute details, in an accurate and chronological manner, are made available to the CSB for consideration and analysis. Photos, videos, and drone footage are ideal evidence, documenting an accidental release, firefighting efforts, and post-accident scenes. The exact location of various pieces of equipment must be known, as observed by the witnesses. It must also be understood what the witnesses saw, and what they did, before, during and after an incident, so a proper analysis of an accident scene, and all evidence within that accident scene,

can be made. Whether equipment was moved, what valve position(s) may have been, what the orientation of piping or other equipment was before, during and after the accident and response, what was seen or heard or even smelled by witnesses at crucial times during the accidental release, during firefighting, and after the accident, can all help the CSB ascertain a technical cause of an accident even when there is a scene of total devastation, which gets further compromised by firefighting activities, such as what occurred at ITC. Any early comments made by witnesses, which may not have been repeated in subsequent interviews, consistent or inconsistent statements, along with any contemporaneous dialogue that may have occurred with these critical witnesses on matters of fact, observations and opinions, as captured in contemporaneously produced or close-in time scribe notes, are also necessary in the CSB's experience. The potential for learning how, when and where a leak may have started, or some other point of origin for the fire, and how the fire progressed through the tank farm while an active incident and during emergency response is critical to the CSB's understanding of what happened and what could be done differently in the future to prevent or mitigate the effect of such an incident through the agency's safety recommendations program. Generally, this type of information is readily provided by local first responders, so CSB investigators can immediately start to make use of that information and pursue various lines of inquiry, evidence collection, sampling, testing, and the like. The CSB has been deprived of this critical information and it cannot go back and recreate it for itself due to the passage of time and changed circumstances. Ex. 1, ¶ 26.

> b.     Similar to the justification noted above with respect to the information requested relating to the ITC investigation, the information requested of KMCO is directly relevant to the CSB's ongoing investigation in that matter, and the desired information will reveal, corroborate

or otherwise document critical facts and conditions related to the accident, the accident scene, and post-accident operations undertaken by first responders and others. Whether by photo, video, or drone footage, as well as witness testimony, the CSB must understand how the leak at KMCO evolved, when and where it began, and how the incident progressed, including response by company officials, employees and contractors, and first responders. The CSB must learn more about the nature and extent of injuries and see what it can learn what it can from those first responders who have completed incident reports that document things like chronological accident timelines, key facts and observations that led to particular responses on the ground during firefighting and emergency response, and the like. It is also critically important that the CSB learn the details about the removal of the y-strainer, the central piece of evidence in this investigation, which is yet to be tested, from planning to eventual execution of that testing, to ensure the physical integrity of the y-strainer remained intact, to verify that chain of custody was maintained, and to make any adjustments needed in testing or analytics with respect to the y-strainer in its current state versus how it was found when located *in situ* within the facility. By way of comparison to other investigations where a local Fire Marshal office is cooperating, in the CSB's PES investigation, which is focused on an even larger and more significant accidental release investigation at a refinery in Philadelphia, Pennsylvania which occurred on June 21 – approximately two months after KMCO – the CSB has already taken custody of critical evidence and sent it out for testing.  Ex. 1, ¶ 37.

33.    <u>Information not in CSB Possession</u>. Respondent blocked CSB access to evidence, information and people, demanding cooperation from the CSB and indicating it would cooperate with information sharing in return, and then refusing to provide the CSB with what it needed, but only after the CSB's opportunity to gather such time-sensitive information

for itself had passed.  Ex. 1, ¶ 45, 49, 51, 52. Respondent then failed to comply with the two administrative subpoenas properly issued by the CSB in the furtherance of its statutorily authorized investigations, even though it has honored similar subpoenas in the past.  Ex. 1, ¶¶ 14, 40-42. Respondent's refusal to comply with the subpoenas continues as of the date of this Petition. The books, papers, records, documents, response to interrogatories, or other data sought by the subpoenas are not in the possession of CSB, and they are needed.  Ex. 1, ¶¶ 3, 29, 43, 45-46, 49, 51-52.

34. <u>Proper Procedures</u>. All administrative steps required by 42 U.S.C. § 7412(r)(6)(L), (M), and 42 U.S.C. § 7607(a) for the issuance of the subpoenas have been taken, including following all established CSB internal procedures.  Ex. 1, ¶¶ 3, 28, 44.

**VI.    CAUSE OF ACTION**

35. Petitioner re-alleges and incorporates by reference, as is fully set forth herein, the allegations in paragraphs 1-34 above.

36. This Court should enforce the abovementioned subpoenas as each accidental release is well within the CSB's investigative jurisdictional mandate and satisfies its burdens under applicable federal law. *See* 42 U.S.C. §§ 7412(r)(6)(C)(i), (E), (L)(i) and (M); *Powell*, 379 U.S. at 57-58; *Burlington Northern Railroad*, 983 F.2d at 637.

37. The CSB has previously appeared in this federal circuit and successfully enforced its administrative subpoenas, which were then affirmed on appeal.  In *United States v. Transocean Deepwater Drilling, Inc.,* 767 F.3d 485, 489 (5th Cir. 2014), the CSB issued five administrative subpoenas to Transocean with respect to its role as the driller in the CSB's investigation of the Macondo well blowout. This blowout and accompanying explosion and fire killed eleven workers, released extremely hazardous substances into the ambient air (along with

five million barrels of oil into the Gulf of Mexico), sank the drilling rig *Deepwater Horizon*, and caused significant environmental and property damage. The enforcement of the two administrative subpoenas in the case at bar are even more straightforward, because there is not a jurisdictional dispute being raised by Respondent, and the matters being investigated at ITC and KMCO are exactly the type of incidents Congress intended for the CSB to investigate. Both involve serious accidents that specifically involved releases of extremely hazardous substances into the ambient air from stationary sources, causing fatalities, serious injuries, and posed threats to the communities adjacent to the facilities and the public at large, along with significant private property damage. In reviewing jurisdiction for enforcement, it is noted that a district court may not inquire into an agency's jurisdiction in an action for enforcement of an administrative subpoena so long as the material sought by subpoena is not "plainly incompetent or irrelevant to any lawful purpose" of an agency.  *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943); *In re Ramirez*, 905 F.2d 97, 98-99 (5th Cir. 1990).

38.     The subpoenas issued are for a lawful purpose and within CSB's statutory authority, the information subpoenaed is relevant and necessary to the purpose for which it was subpoenaed, the subpoenas are reasonable and not overly broad or burdensome, and the subpoenas have not been issued for an improper purpose such as harassment.  *See Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 209 (1946); *Chevron U.S.A., Inc.*, 186 F.3d 186 F.3d 644, 647 (5th Cir. 1999); *Winters Ranch Partnership v. Viadero*, 123 F.3d 327, 329, 335 (5th Cir. 1997); *Burlington Northern Railroad*, 983 F.2d at 631, 638-39, n.3; *F.T.C. v. Jim Walter Corp.*, 651 F.2d 251, 258 (5th Cir. 1981) ("a subpoena is not unreasonably burdensome unless compliance threatens to unduly disrupt or seriously hinder normal operations of a business.").

39.     A state government or local subdivision thereof should not be able to frustrate a legitimate federal statutory purpose. "The Constitution, and the laws of the United States which shall be made in pursuance thereof . . . under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."  U.S. CONST., ART. VI.

40.     Several cases decided by the U.S. Supreme early in the history of the young republic involved state laws that conflicted with laws or programs initiated by the federal government. In *McCulloch v. Maryland*, 17 U.S. 316 (1819), the Court struck down as unconstitutional a tax levied by the State of Maryland against the Bank of the United States. In writing for the Court, Chief Justice Marshall held that "the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government."

41.     The scope of state laws deemed unconstitutional since those early years is wide. In *Cooper v. Aaron*, 358 U.S. 1 (1958), the Court struck down state laws being implemented by Little Rock school authorities to avoid implementing school desegregation ordered by *Brown v. Board of Education*. In *Edgar v. Mite Corp*., 457 U.S. 624 (1982), the Court struck down the Illinois Business Take-Over Act as both preempted by the Williams Act (a federal law that defines of rules of acquisitions and tender offers) and that it unduly burdened interstate commerce in violation of the Commerce Clause.

42.     Cases along the lines noted above yielded the doctrine of federal preemption. There are two forms of preemption recognized by the Supreme Court. The form of preemption relevant in the matter at bar is called conflict preemption. In *Gade v. National Solid Wastes*

*Management Ass'n,* 505 U.S. 88 (1992), the Supreme Court reviewed a case involving conflict

preemption. In 1986, the Occupational Safety and Health Administration (OSHA) promulgated

interim regulations (later made final) which specified training requirements for employees

engaged in hazardous waste operations. In 1988, while OSHA's interim regulations were in

effect, the state of Illinois – without approval of the Secretary of Labor for a state plan for the

development and enforcement of an occupational safety and health standard – enacted two acts

which required the licensing of hazardous waste equipment operators, and laborers working at

hazardous waste cleanup sites. Before the Illinois licensing acts were to go into effect, a

hazardous waste trade association brought an action in federal district court against the director

of the Illinois Environmental Protection Agency (IEPA), seeking to enjoin the IEPA from

enforcing the Illinois licensing acts on the ground that such acts were pre-empted by the

Occupational Safety and Health Act. In ruling in favor of the trade association, the Court

explained:

> Pre-emption may be either expressed or implied, and "is compelled whether Congress'
> command is explicitly stated in the statute's language or implicitly contained in its structure and
> purpose." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, (1977); *Shaw v. Delta Air Lines, Inc.*,
> 463 U.S. 85, 95 (1983); *Fidelity Fed. Sav. & Loan Assn. v. De la Cuesta*, 458 U.S. 141, 152-
> 153 (1982). Absent explicit pre-emptive language, we have recognized at least two types of
> implied pre-emption: field pre-emption, where the scheme of federal regulation is "'so
> pervasive as to make reasonable the inference that Congress left no room for the States to
> supplement it,'" . . . and conflict pre-emption, where "compliance with both federal and state
> regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373
> U.S. 132, 142-143 (1963), or where state law "stands as an obstacle to the accomplishment and
> execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52,
> 67 (1941); *Felder v. Casey*, 487 U.S. 131, 138; *Perez v. Campbell*, 402 U.S. 637, 649 (1971).
> (Internal and parallel citations omitted, emphasis added.)

*Gade* at 19.

43.     In the present case, Respondent's adherence to asserted state law create a

"physical impossibility" for her to comply with federal law, specifically, the Clean Air Act, and

simultaneously "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" with respect to the successful accomplishment of the CSB's mission requirements in these two investigations. As a result, this is a case of clear conflict preemption, on two separate ground. Respondent cannot seek to comply with some aspect of Texas law relating to her office's mission work in the face of legitimate CSB needs for information – especially where concerns raised by the Respondent are unfounded and sharing information with the CSB will not imperil any Respondent's work – and Respondent's position in withholding critical information stands as an obstacle to the accomplishment and execution of the full purposes of the CSB's statutory mission, as mandated in the Clean Air Act. *See also PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011) (on the issue of differing regulatory requirements imposed by both the federal and state government with respect to drug labeling federal law preempted competing state law requirements because "When the "ordinary meaning" of federal law blocks a private party from independently accomplishing what state law requires, that party has established pre-emption." *Id*. at 623. Respondent's bare assertion that state law requires it not to share information with the CSB due to the CSB not being an "enforcement agency" – even in the face of federal administrative subpoenas issued by the CSB's in accordance with its clear statutory powers – then Respondent's asserted state law objections to the cannot stand.

44.     Similarly, in *United States Department of Justice v. Utah Department of Corrections*, 2017 U.S. Dist. LEXIS 118470, (D. Utah July 27, 2017), a district court faced a conflict that arose between a state law requiring federal law enforcement to have a search warrant in order to access a drug related database on one hand, and the DEA's administrative subpoena power on the other. The district court found that such a case presented a conflict

where the federal and state laws "cannot consistently stand together" so "the state law must give way to federal law" within our constitutional system. *Id*. at *16-17. This logic is especially applicable in the matter at bar where no specific state law is even cited by Respondent, and there is only a vague assertion that somehow the CSB obtaining the relevant information would "interfere with Respondent's "detection, investigation and prosecution of crime," and then incorrectly asserts that the mechanism for such "interference" is found in the CSB's enabling statute at 42 U.S.C. § 7412(r)(6)(Q) which instructs information sharing with the public, and other named agencies. However, this argument misses the overall meaning subsection (Q) and the intended protection of confidential information, and ignores (1) the established CSB practice to release information to the public only upon request through the Freedom of Information Act; and (2) the equally long-standing CSB practices for protecting CSB records from disclosure during an open and ongoing CSB investigation (pursuant to the deliberative process via Exemption 5 of the Freedom of Information Act) and protecting CSB records from disclosure that could jeopardize any ongoing law enforcement investigation (on the basis of not interfering with enforcement proceedings via Exemption 7 of the Freedom of Information Act). *See* 5 U.S.C. §§ 552(b)(5) and (7)(a).

45.    Ironically, in no way does the CSB want to exclude its federal or state or local agency partners who may be participating in investigating either ITC or KMCO, whether in administrative, civil or criminal investigations. Moreover, the CSB does not want to impair the efficacy of any other agencies' respective investigations. However, at a minimum, the CSB must be allowed to conduct its own independent investigation pursuant to its established, lawful authorities, in a timely and efficient manner, without interference from any state, county or local government, or other political subdivision. To meet its statutory mission requirements, the

CSB requires the information it has been deprived of due to Respondent's interference, and now at issue in the matter of enforcing these two administrative subpoenas. The United States asks that the subpoenas now be enforced.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully prays:

1.      That the Court enter an Order directing Laurie L. Christensen, the Fire Marshal for Harris County, Texas, to comply with the CSB Subpoena and produce all items described in the subpoena, or confirm in writing that no such items exist, within 14 days after the Order.

2.      That the Court grant the United States such other and further relief as the Court deems necessary and appropriate.

Respectfully submitted,

RYAN K. PATRICK
UNITED STATES ATTORNEY

BY:      _/s/ Jose Vela Jr._
Jose Vela Jr.
Assistant United States Attorney
Attorney in Charge
Fed ID# 25492
Texas State Bar No. 24040072
1000 Louisiana Street, Suite 2300
Houston, Texas 77002
(713) 567-9000
Fax: (713) 718-3300
Email: Jose.Vela@usdoj.gov

ATTORNEY FOR THE PETITIONER